REQUESTED ORAL ARGUMENT NOT SCHEDULED

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT

---

No.   13-7159

---

WILLIAM BOYKIN, ET AL.,

APPELLANTS,

v.

VINCENT GRAY, ET AL.

APPELLEES.

---

ON APPEAL FROM REVIEW OF A DECISION OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

BRIEF FOR APPELLANTS

---

GEORGE E. RICKMAN
DC Bar 433298
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
georgerick11@comcast.net
*Counsel of Record for Appellants*
*Lead Counsel*

JANE ZARA
DC Bar 982392
1611 Monroe Street, N.W.
Washington, D.C.  20012
202-483-9393

## TABLE OF CONTENTS

I.     STATEMENT OF JURISDICTION……………………………………1

II.    ISSUES PRESENTED………………………………………………..1

III.   STATUTES PERTINENT TO APPEAL………………………………..2

IV.   SUMMARY OF ARGUMENT…………………………………………3

V.    STATEMENT OF FACTS…………………………………………….5

VI.   ARGUMENT……………………………………………………………22

A) The District defendants did not meet their burden to be awarded summary judgment in proving that the PSH program did not have a disparate impact on the overwhelmingly African-American homeless population in the District of Columbia………………….………...22

Standard for Summary Judgment…………………………………………22

I.       The Boykin plaintiffs established a *prima facie* case of disproportionate and segregative effects…………………….25

II.      Contrary to the District Court's conclusion, the closing of low-barrier shelters caused an adverse impact on a protected class, and the Boykin plaintiffs raised a material issue of fact as to the credibility of the District defendants' proffered legally sufficient justification…………………………………………..32

III.     The District defendants did not prove a legally sufficient justification such that a reasonable jury could not find for plaintiffs…………………………………………………...37

a) The District Defendants' Proffers of Legally Sufficient Justification……………………………………………….37

b) The District's legally sufficient justification does not support summary judgment…………………………………………..39

IV.     The District defendants did not meet their burden in proving that no less discriminatory alternative existed……………….41

B) The District Court erred in dismissing the Boykin plaintiffs' counts alleging intentional discrimination under the Fair Housing Act. Based on the statistical evidence that reflected the demographic make-up of the areas of the city-run shelters, the Boykin plaintiffs alleged a prima facie case of discrimination that went without reasonable justification……...45

C) Plaintiffs alleged claims cognizable under disabilities discrimination under the FHA. For the same reasons articulated above, the District court erred in dismissing this count of the complaint………………………...52

VII.   CONCLUSION……………………………………………………….58

# TABLE OF CASES CITED

*Aka v. Washington Hospital Center,* 156 F.3d 1289 (D.C. Cir. 1998)(*en banc*).......................................................................................22,24,39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). …………………….22

*Bronk v. Ineichen*, 54 F.3d 425 (7th Cir. 1995)…………………………………....53

*Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977)……………….52

*Chin, et al., v. Port Authority of N.Y. and N.J.,* 685 F.3d 135 (2nd Cir, 2012)……31

*City of Edmonds v. Washington State Building Code Council*, 18 F.3d 802 (9th Cir. 1994)……………………………………………………………………………53

*Gallagher* v.*Magner,* 619 F.3d 823, 834 (8th Cir. 2010)……………...……22,42,52

*Griggs v. Duke Power Co.,* 404 U.S. 421 (1971)…………………………………....26

*Graoch Assocs. #33, L.P.* v *Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374–78 (6th Cir. 2007)……………………….....…23,52

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2nd Cir.2003)………………………..52

**Huntington Beach NAACP v. Town of Huntington Beach*, 844 F.2d 926 (2nd Cir. 1988)……………………………………………………………………………*passim*

*Jackson v. Okaloosa County Fla.*, 21F.3d 1531 (11th Cir.1991)…………………47

*McDonnell Douglas v. Green,* 411 U.S. 792 (1973)…………………………..22,44

*Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977)……………………………………………...…..21,25

*Mt. Holly Gardens Citizens in Action, Inc.* v *Twp. of Mount Holly,* 658 F.3d 375, 382 (3rd Cir. 2011)……………………………………………...……..23,42,43

*Mountain Side Mobile Estates v. HUD,* 56 F.3d 1243 (10th Cir. 1995)…………...42

*Raytheon Co. v. Hernandez*, 540 U.S. 44 (2002)…………………………….....52

*Sofarelli v. Pinellas County*, 931 F.2d 718 (11th Cir. 1991)……………………….49

*Tenants' Association of 2922 Sherman Avenue v. District of Columbia , 444 F.3d 673 (D.C. Cir. 2006)……………………………………………………*passim*

*Tsombandis v. West Haven Fire Dep't.* 352 F.3d 565 (2nd Cir. 2003)…………...53

*Turning Point v. City of Caldwell*, 74 F.3d 941 (9th Cir. 1996)……………...…53

*United States v. City of Black Jack, Missouri*, 508 F.2d 1179 (8th Cir. 1975)…....36

*United States v. City of Chicago Heights*, 161 F.Supp.2d 819 (N.D. Il. 2001)…..52

*Saint Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993)……………...……24,39

*Segar v. Smith,* 738 F.2d 1249 (D.C. Cir. 1984)…………………………………31

*State of Arizona v. City of Cottonwood,* CV-11-1576 (DAZ 2012)………………31

*Stout v. Potter,* 276 F.3d 1118 (9th Cir. 2002)……………………………….……31

*Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C. Cir. 2002)…………...24

*Watson v. Fort Worth Bank & Trust,* 487 U.S. 977(1988)………………………..31

## STATUTES AND REGULATIONS CITED

42 U.S.C. § 3604(f)……………………………………………………………..52

42 U.S.C. § 12132……………………………………………………………….52

24CFR Sect. 100.500(c)…………………………………………………………42

24 CFR Sect. 100.500 (b)(2)…………………………………………………….23

* Denotes cases principally relied on

## JURISDICTIONAL STATEMENT

Appellants filed suit in the United States District Court for the District of Columbia on October 22, 2010, alleging violations under *The Americans With Disabilities Act,* 42 U.S.C. §§ 12101 *et seq.*, 12131, and 12132, *The Fair Housing Act,* 42 U.S.C. §§ 3601-3631 and 3604(f)(1), and The United States Constitution for acts and omissions committed in the District of  Columbia. The complaint was amended with leave of court to add factual allegations arising under the same statutes and constitutional provisions.

On October 4, 2012, the United States District Court entered an order dismissing the amended complaint. And on September 30, 2013, the District Court entered orders granting judgment in favor of the District defendants, and on September 18, 2013 the District Court entered orders denying motions to further amend the complaint and to reconsider its order dismissing counts in the second amended complaint. The Clerk entered a timely notice of appeal from theses order on October 9, 2013. Jurisdiction is therefore proper in the United States Court of Appeals for the District of Columbia Circuit. 28 U.S.C. Sect. 1291.

## ISSUES PRESENTED

A)     Whether the District Court erred in granting judgment in favor of the District of Columbia defendants ("District defendants") on the count alleging disparate impact based on race under the Fair Housing Act for a policy that

1

closed low-barrier shelters in the predominantly white, gentrifying sections of the District of Columbia.

B)   Whether the District Court erred in dismissing the count that alleged disparate treatment based on race arising under the Fair Housing Act for the closing of the only remaining low-barrier shelter in Northwest Washington in an area gentrifying, predominantly and white.

C)   Whether the District erred in dismissing those counts alleging discrimination based on disability, both disparate impact and disability, arising under the Fair Housing Act for closing the only remaining low-barrier shelter in Northwest Washington that was near services need by the homeless population it served.

## STATUTES PERTINENT TO THIS APPEAL

42 U.S.C. 3604: As made applicable by section 3603of this title and except as exempted by sections
3603(b) and 3607of this title, it shall be unlawful—
   (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin* (emphasis added).

42 U.S.C. § 3604(f): (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of —
   (A) that person; or
   (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
   (C) any person associated with that person…

2

## SUMMARY OFARGUMENT

From the outset of this litigation, the Boykin plaintiffs alleged that the

District of Columbia has engaged in a policy that has resulted in the closure of

low-barrier shelters in the Northwest quadrants of the city. Notwithstanding any

claim or defense that these closings are a part of a broader policy shift to its

Permanent Supportive Housing ("PSH"), the result has been the denial of housing

to protected classes of people, resulting in both disproportionate and segregative

effect on these communities. Given the known and existing burdens on the PSH

program, the District defendants' claim of a legitimate policy was and remains

unrealistic. Indeed, given the strains on the system that is contemplated to serve the

entire homeless population, the claimed policy of shifting resources to the PSH

program bore no legitimacy, placing the entire homeless system in jeopardy and

those caught in it at risk of serious harm.

The District Court erred in granting the District defendants summary

judgment. First, the District Court failed to apprehend the scope of the Boykin

plaintiffs' allegations, limiting its statistical analysis to the closing of one shelter.

Instead, the allegations relied on the loss of total bed space in the system as a

whole and the adverse effects on a homeless population that is over 85% African-

American as compared to this same population comprising a little over 50% of the

total city population. These adverse effects are reflected in the persistent overcrowding of the remaining shelters, increases in the numbers of unsheltered homeless and a system of Permanent Supportive Housing that remains strained beyond its limited means.

Second, the District Court applied an incorrect analysis in granting summary judgment to the District defendants on the theory of segregative effect. The District defendants closed all city operated shelters in the Northwest, predominantly white, gentrifying quadrants of the city as compared to the racial composition of those areas in which the remaining shelters are located. As argued below, following the closing of La Casa Shelter, there were zero city operated low- barrier shelters in the western part of the city. Equally so, the focus in the complaint was on shelter, or bed space, as a determinant factor as opposed to the District Court's analysis that demanded a showing that the closings caused a shift in the homeless populations to other parts of the city.

The District Court further erred by dismissing those counts alleging intentional discrimination based on race under the *Fair Housing Act*, 42 U.S.C. § 3604. By requiring allegations that indicated an actual shift in the homeless population other than the loss of low-barrier shelters, the District Court extended disparate impact theory beyond the proportions that command the analysis. This type of granular analysis is not required. Even so, included in the Boykin plaintiffs'

4

allegations were their specific complaints that none received any housing alternative other than the few who obtained shelter space in those eastern parts of the city.

The same reasoning holds true for those claims arising under the disability prong of *Fair Housing Act,* 42 U.S.C. 3604(f) and *The Americans With Disabilities Act,* Act, 42 U.S.C. 12131 *et seq*. The Boykin plaintiffs alleged facts indicating cognizable disabilities in both the broader homeless populations and the individual plaintiffs in this case, and that these persons were denied housing as a *prima facie* case. The Boykin plaintiffs further alleged facts indicating that the closing of the La Casa Shelter had the effect of denying services to this population that were once available and accessible.

## STATEMENT OF FACTS

In the face of mounting failures regarding the care and maintenance of the District of Columbia's system of homeless services, the District of Columbia ("District") has continued its policy of closing low barrier shelters for the homeless, leaving this vulnerable population without any options. Throughout this litigation the District has insisted that its shift away from low barrier shelters to a system of Permanent Supportive Housing ("PSH") is a legitimate policy to address the problem of long term homelessness; the reality is that the PSH is an inadequate means to address the rising tide of homelessness in the District and instead is a

thinly veiled subterfuge to displace a minority population from the Northwest

quadrant of the city. This case fits in this pattern and policy of displacement.

The Washington Legal Clinic for the Homeless (WLCH) reports that

approximately 16,000 people are homeless in Washington DC over the course of a

year, one of highest rates in the country. Plaintiffs' Mot for Temporary Restraining

Order (10/22/10)  Pl. Ex. 4, Docket #11-6, *WLCH, Homelessness and Poverty,*

*Washington, DC* (2009) at 1-2 (hereinafter "*WLCH Report*"), App. 8. Prior to

closing La Casa, the Urban Institute reported that at least 13,000 single adults and

2,800 adults and children use emergency shelter in the District every year. Pl.'s

Mot. for TRO, Pl. Ex. 7, Docket#11-8, *Major Recommendations:  Summary Report*

*of the Urban Institute's Assessment of the District of Columbia's Public Homeless*

*Assistance System*, June 2, 2008 at page 2 (hereinafter "*Urban Institute Report*"),

App. 9. The report further describes at least 2200 persons as being "chronically

homeless" in 2008 and admits that this number may increase by several hundred

during the course of a year (WLCH reported a similar number of over 1900

homeless persons). *Id.* Of these numbers, WLCH reported that and that the shelters

were in excess of capacity on a regular basis: 164% over capacity at New York

Ave., 125% over capacity at Franklin Shelter, 111% over capacity at 801 East.

This report illustrated the regular overcapacity of shelters prior to closing of

downtown Franklin Shelter and La Casa Shelters. On January 27, 2010, 6,539

literally homeless persons were counted. Def.'s Mot. for Summary Judg., Exh. 5, Docket #78-5, App. 13.  This was an increase of 5% from the Point in Time 2009. *Id.* Even with the ever increasing incidents of homelessness in the District of Columbia the District pursued its policy of displacement through the closing of low-barrier shelters.

On October 15, 2010, the District closed La Casa Shelter, a low barrier shelter for homeless men located on Irving Street between 14th and 16th Streets in the Columbia Heights section of Northwest Washington D.C. The last remaining public shelter for homeless men in Northwest D.C. operated by the District, La Casa was located in the center of an area teeming with new development and fast paced gentrification. Across the street from what was once the shelter's location is the new USA Mall. Surrounding the shelter was a newly built complex of high-end apartments. Indeed, in the immediate vicinity of what was once La Casa are any number of new luxury condominiums and apartments. The property values in the area have seen a dramatic increase from the time La Casa first opened its doors for services to area's population of homeless men. Affordable housing in the area has become scarce. La Casa Shelter was replaced with Highland Park luxury apartments after conveyance of the land to Donatelli Development..

Prior to the closing of La Casa Shelter, and as part of an ongoing pattern of displacement, the District closed Franklin Shelter, another low barrier shelter in

7

Northwest, Washington, D.C.  Between the two closures, the District removed all available shelter space in District operated facilities in the Northwest quadrant of the city and reduced its available shelter space for men by over thirty percent (30%). The closings have had adverse effects on the homeless system as a whole, adding additional strain the District's PSH program, a program intended to serve the entire homeless population that includes individuals and families. As far as the Northwest section of the city, the closure of La Casa restated the old adage of living "on the other side of the tracks," marking the final step in removing all low-barrier shelters from what has always been the more affluent parts of the city as a part of the city's drive for economic development.

With the rise in development and property values, the Columbia Heights area has been a part of a demographic shift in the city's populations. In the census reports from 1990 to the most recent report in 2010, all relevant census tracts in the Columbia Heights area indicate a precipitous drop in the number of African-American residents with a commensurate increase in the number of Caucasians.

Census Tract: 28.01:

1990: 59% Black, 33% Hispanic, 4.5% White

2000: 52% Black, 39% Hispanic, 5.7% White

2010: 36% Black, 37% Hispanic, 22% White

Census Tract: 28.02:

1990: 45% Black, 43% Hispanic, 6.7% White

2000: 32% Black, 51% Hispanic, 8.5% White

2010: 25% Black, 44% Hispanic, 27% White

Census Tract: 27.02:

1990: 31% Black, 32% Hispanic, 56% White

2000: 22% Black, 34% Hispanic, 38% White

2010: 13% Black, 32% Hispanic, 36% White

Census Tract: 29:

1990: 84% Black, 14% Hispanic, 1.7% White

2000: 56% Black, 38% Hispanic, 4.8% White

2010: 31% Black, 35% Hispanic, 29% White

Census Tract: 30:

1990: 81% Black, 12% Hispanic, 5.8% White

2000: 62% Black, 28% Hispanic, 8.6% White

2010: 43% Black, 16% Hispanic, 36% White

Census Tract 27.01 in Ward 1, where La Casa was located, has a 17% poverty rate and 5.9% unemployment rate. Pl. Sec. Am. Compl, Docket #74-2, App. 12. Census Tract 1 is representative of Ward 2, where Franklin Shelter, another low barrier shelter in Northwest had been closed prior to the closing of La Casa, is comprised of 4.8% Blacks, 86% Whites, 4.1% Hispanics, 5.2% poverty rate, and 1.9% unemployment rate. *Id.* Census Track 51, also in Ward 2, is

9

comprised of 25% Blacks, 59% Whites, 13% Hispanics, 9.4% poverty rate and 4.3% unemployment rate. *Id.*

Census tract data providing the racial demographics of the relevant census tracts from the FY 2010 census of areas surrounding the various shelters are listed below. Included in this data are population demographics for La Casa Shelter, located in Ward 1 in Northwest Washington, D.C., Adams Shelter and New York Avenue Shelter, located across town in Ward 5 in Northeast Washington, D.C., and 801 East, located on the grounds of Saint Elizabeth's Hospital in Southeast Washington, D.C. in Ward 8.

**La Casa Shelter**

Census Tract **28.01**:  2010: 36% Black, 37% Hispanic, 22% White

Census Tract **28.02**:  2010: 25% Black, 44% Hispanic, 27% White

Census Tract **27.02**:  2010: 13% Black, 32% Hispanic, 36% White

Census Tract **29**:  2010: 31% Black, 35% Hispanic, 29% White

Census Tract **30**:  2010: 43% Black, 16% Hispanic, 36% White

**Adams Place Shelter located in Ward 5**

Census Tract **88.04**: 2010:  91% Black, 5.4% Hispanic, 2.9% White

Census Tract **90**:  2010: 91% Black, 2.8% Hispanic, 3.7% White

Census Tract **91.01**: 2010: 87% Black, 7.0% Hispanic, 5.0% White

Census Tract **91.02**: 2010: 93% Black, 2.3% Hispanic, 4.2% White

**NY Avenue Shelter located in Ward 5**

Census Tract **88.02**: 2010: 88% Black, 4.2% Hispanic, 6.6% White

Census Tract **88.03**: 2010: 56% Black, 8.1% Hispanic, 31% White

Census Tract **88.04**: 2010: 91% Black, 5.4% Hispanic, 2.9% White

**801 East Shelter located in Ward 8**

Census Tract **98.03**: 2010: 98% Black, 1.1% Hispanic, 0.8% White

Census Tract **98.07**: 2010: 96% Black, 1.9% Hispanic, 1.2% White

Census Tract **98.09**: 2010: 90% Black, 2.0% Hispanic, 7.4% White

Census Tract **99.02**: 2010: 97% Black, 1.5% Hispanic, 0.9% White.

*See,* "Proposed Mot. to Amend," Docket # 84-1, *also see*  Def.s' Mot for Sum Jud.

Exh., Docket # 78-3.

The District defendants admit that in 2010 87.2% of the men served in

shelters were African-American or Hispanic as contrasted with these groups

comprising 61.3% of the District's total population. Def.'s Stmt. of Mat. Fact para.

3, Docket # 27-2, App. 5.  Recent information provided by the District defendants

indicates that at the present time, the broader homeless population in the District is

comprised of 84% African-Americans. *Id.* Upon information and belief this pattern

persists to the present day, and that based on the disproportionate representation of

African-Americans in the homeless population it is reasonable to infer that the

populations of both La Casa Shelter and Franklin Shelter were of similar

proportions. The most recent census data for the District of Columbia indicates that

11

African Americans comprise 52% of the total population of the District. Def.'s Stmt. of Material Facts para. 5, App. Twenty two 22% of the District's population is disabled.

Based on the District defendants' own admission and a report from D.C. Cares, the homeless population in the District of Columbia is comprised of a larger percentage of persons suffering from some cognizable disability. Further, according to the *Greater D.C. Cares Factsheet*, 71% of homeless individuals and 53% of some person in homeless families living in the District of Columbia suffer from either substance abuse or a mental illness. Pl.s' Mot. for Temp. Rest'g. Order (10/22/10)  Pl. Ex. 4, Docket #11-5,  *D.C. Cares Fact Sheet* also see *The Community Partnership for the Prevention of Homelessness Published Fast Facts on Homelessness in D.C. 2008* at p. 2, App. 15. The report further indicates that 40% of the "street-bound" homeless have co-occurring disabilities, ie. mental illness and chemical dependency. *Id.* Of the broader homeless population, 36% of individual homeless suffer from chronic substance abuse, 19% suffer from debilitating mentally illness, 16% are dually diagnosed, and 12% are living with HIV/AIDS.  The report further indicated that, among single homeless persons in low barrier shelters, 26.6% have chronic health problems, 34.5% are chronic substance abusers, 2 percent are living with HIV/AIDS, 23.1% are physically

disabled, and 18.9% are severely mentally ill - only 9.2% of the population reported no disability. *Id.*

In this case, every plaintiff self-reported some cognizable disability. Some reported having chronic schizophrenia, others reported debilitating physical disabilities from diabetes to amputations. Pl.'s Sec. Amended Compl., Docket # 74-1, App. 16. Most if not all suffered from chronic substance abuse. *Id.* And all reported the separation from or increased difficulty in obtaining the needed services that were available in the Columbia Heights area. *Id.*

For its part, the District has maintained throughout that the shelter closings are a part of a broader policy shift away from low-barrier shelters to s system of permanent supportive housing. The District contends that this policy represents an effort to move the chronically homeless population into a system that will provide a stable living arrangement with those accompanying services needed to address the wide-ranging disabilities at issue in the homeless population. The PSH system is meant to address the entire homeless population, both individuals and families, with priority given those facing the most serious disabilities.

But PSH has failed to begin the meet the ever-growing needs of an expanding population. At The Inter-Agency Council on Homelessness' ("ICH") bi-monthly meeting on February 25, 2009, Fred Swan, a District official, reported that over 3,100 homeless singles and over 360 homeless families had completed

13

assessment forms in efforts to obtain housing through PSH, but only 414

individuals and 1 family had been housed through the program.  ICH Meeting

Minutes, Feb. 25, 2009," Pl.'s Mot. for TRO, (10/21/10) Docket# 11-2, App. at   .

App. 10. Anecdotal evidence collected as a part of this litigation amplifies the low

number of placements as former La Casa residents state that they have been forced

to shelters on the other side of the city or instead opt to sleep and stay in the alleys,

parks and other available space in the Columbia Heights area to maintain a

connection with the available services. App. 16. Former residents of Franklin

Shelter experienced these same failures in obtaining PSH housing. And, as stated

above, the District has, at the relevant time period and, upon information and

belief, continues to experience over-crowding in all of its facilities for the

homeless.

Even with the limited number of placements, available data on PSH

placements indicated that the overwhelming majority of these placements have

been in eastern part of the city. In a report on placements that followed the closing

of Franklin Shelter, of the three hundred and five (305) placements identified in the

report thirty (30), or less than ten percent (10%), were made in the western wards

of 1 and 4.  None were made in Wards 2 or 3, areas that include downtown,

Georgetown and other affluent areas west of the Rock Creek Park with the highest

Caucasian populations. The District offered no evidence countering this trend in

14

placements. Moreover, even with these minimal placements thousands of homeless men, women and families have not been placed.

In support of its motion to vacate a December 12, 2003 Consent Order and to dismiss action for violating the Erwin Act by failing to provide community-based alternatives to institutionalizing the mentally ill, the District admitted recently that the goal to house 70% of its consumers in the mental health system is "impossible to achieve" because that would unrealistically require "an inexhaustible supply of available, low-cost housing" which is currently lacking in the District. The District stated that it "…cannot defy economic reality to create additional housing on such a massive basis as to comply …" with the court's criteria for lifting oversight. See Pl. Ex. 5, filed Dec. 6, 2010, Excerpts from Civil Action No. 74-385 (TFH), Memorandum in support of motion to dismiss at page 7, filed September 4, 2009.

The Litigation in the United States District Court:

In the first round of pleadings in the United States District Court ("District Court") the District Court allowed the Boykin plaintiffs to go forward on one court that alleged that the closing of La Casa Shelter violated the Fair Housing Act, 42 U.S.C. 3601 *et seq.*, on a theory of disparate impact based on race, and in so doing, held that low-barrier shelters were covered by the FHA. The District Court, however, dismissed those counts that alleged violations of the FHA on theories of

15

disparate impact based on disability, disparate treatment based on race and

disability, or 42 U.S.C. 3601 *et seq*, and disparate impact under the Americans

With Disabilities Act, 42 U.S.C. 12131 *et seq* and a number of theories under the

law of the District of Columbia. *See* Mem. Order (10/4/12)(generally), App. 1.

      In its order the District Court concluded that first the Boykin plaintiffs did

not allege any facts indicating the intent to discriminate against the Boykin

plaintiffs because of their race or disability. Mem. Op. 10/4/12 at pp. 12-16, App. 1

*also see* 42 U.S.C. 3602(a) & (f)(1)(b). The District Court held that it was not

enough to allege the race of those persons displaced and to further color these

allegations with demographic information concerning the locations the District's

remaining shelters. *Id.* Neither did adding information concerning the placement of

homeless residents that occurred two (2) years prior the La Casa Shelter aid in

providing a sufficient basis to go forward on the claims. *Id. also see* "Mayor's

Report" Pl.'s Mot. TRO, Docket #11-9, App. 17. The District Court adopted this

reasoning, in part, in dismissing the disparate treatment based on disability. Added

to this conclusion was that the Boykin plaintiffs did not allege one fact from which

any inference of the intentional discrimination based on disability. For this same

reason, the District Court dismissed the count alleging intentional discrimination

under the *Americans With Disabilities Act,* 42 U.S.C. 12131 & 12132.

Next, the District Court dismissed the count raised under the disabilities prong of the FHA, both disparate effect and intentional, and the theory of disparate impact under the ADA. The District Court concluded that the Boykin plaintiffs failed to allege any facts indicating that the closing of La Casa was because of the residents' disabilities.  Mem. Opp.  10/4/12, at p. 16, App. 1. The District Court further dismissed any theories of disparate impact based on disabilities because the complaint did not allege any specific proportions of the La Casa population who were disabled nor a proportion of the total homeless population in the District. And did not allege a "segregative effect" because the "mere fact" that many of the La Casa residents were disabled cannot support such a theory. *Id* at pp. 22-24.  For these same reasons the District Court dismissed a theory of disparate impact under the ADA. *Id* at p. 27.

The District defendants moved for summary judgment soon after the District Court denied its motion to dismiss the count that alleged a violation of the FHA on a theory of disparate impact based on race. In granting the district defendants' motion, the District Court faulted plaintiffs for not putting forth evidence of record that countered, or created a material issue of fact, concerning the District's recast theories of defense.[1] On the theory of "Disproportionate Effect," the District Court

---

[1] In ruling on the District's "Motion to Dismiss or in the Alternative for Summary Judgment" the District Court stated: "The papers reviewed in connection with this

17

complained that the Boykin plaintiffs could not base liability on a broader

homeless population from the discrete and limited closure of one shelter in the city.

Mem. Op. 9/30/13 at p. 9-11, App. 2. The District Court held that the "analytic

cherrypicking" employed by the Boykin plaintiffs in proving the loss of 90

homeless beds did not justify or prove that the closure had a discriminatory effect

on a population of 6000 homeless persons identified in the District of Columbia.

*Id*. The District Court further indicated that the District admitted to the existence of

such a policy as part of its broader efforts to eliminate homelessness. *Id* at p. 11.

The District Court went on to say that the District submitted uncontroverted

evidence through a declaration by a District official that the broader homeless

population actually benefited from the closing. *Id* at pp. 11-12. The evidence relied

on by the District Court was that as a result of the placement of 600 hundred

---

matter include the following: the defendant's motion to dismiss, or, in the
alternative, for summary judgment ("MSJ") [Dkt. No. 78]; the plaintiffs'
opposition ("Opp.") [Dkt. No. 85-2]; the defendant's reply ("Reply") [Dkt. No.
89]; the defendant's statement of material facts ("Def.'s Stmt. of Material Facts")
[Dkt. No. 78]; the plaintiffs' second amended complaint ("2d Am. Compl.") [Dkt.
No. 74]; the plaintiffs' exhibits to the second amended complaint [Dkt. Nos. 74-1,
74-2]; additional exhibits submitted by plaintiffs [Dkt. Nos. 42-2, 84-1];
Declaration of Fred Swan, Nov. 29, 2010 ("Swan Declaration No. 1") [Dkt. No.
27-1]; Declaration of Fred Swan, Oct. 19, 2012 ("Swan Declaration No. 2") [Dkt.
No. 78-2]; District of Columbia Draft FY 2011 Federal Payment Budget
Justification ("Budget Justification") [Dkt. No. 27-3]; Special Warranty Deed [Dkt.
No. 27-5]; and additional exhibits submitted by both parties, though not cited in
this Opinion." *See Burke v. Gould,* 286 F.3d 523 (D.C. Cir. 2002).

persons in Permanent Supportive Housing the available bed-space increased despite the loss of 390 beds due to the closure of both Franklin and La Casa shelters. *Id.* The District Court also acknowledged the planned building of an additional forty five (45) bed facility at the location of what was once La Casa. Aside from the forty five (45) beds in Columbia Heights, the District Court made no mention of the location of these additional beds nor pointed to any evidence identifying the specific locations of placements through PSH. *Id.*

Neither did the District Court find that the Boykin plaintiffs met their burden of proving a *prima facie* showing of "segregative effect." Under its analysis of "segregative effect," instead of focusing on the loss of all available low barrier shelter bed space the District Court demanded that the evidence show an overall decrease in the numbers of homeless persons in Wards 1 and 2. *Id* at pp. 16-17. The District Court acknowledge the overarching claim advanced by the Boykin plaintiffs that the closing of La Casa was a part of an effort to remove the largely minority homeless population from the Northwest quadrant of the city. But, the District Court continued, the Boykin plaintiffs failed to put forth any evidence of a "measurable impact" the closure of La Casa Shelter had on the area. By example, the court offered that the failure present evidence indicating a shift in the homeless population to those remote eastern parts of the city proved fatal to any showing of

this prong. *Id.* This was despite the uncontroverted evidence that all shelters in the Northwest quadrant of the city were closed.[2]

To counter this, District Court continued, the District offered evidence by way of a declaration that "some" of the placements in Permanent Supportive Housing were or will be made in the Northwest quadrant, including a 45 bed facility located on the site of what was once La Casa, though this evidence was far less than specific. As noted above, however, as part of their submissions that were part of the complaint that asked for extraordinary relief, the Boykin plaintiffs provided specifics that indicated that of 350 placements in PSH, less than 10% were made outside of Wards 5, 7 and 8, and none were made in Wards 2 or 3 or in those areas west of Rock Creek Park, areas that are predominantly Caucasian. "Mayor's Report" Pl.'s Mot. TRO, Docket #11-9, App. 17.

The District Court concluded that under either the Second or Seventh Circuits' analysis the Boykin plaintiffs failed to meet their burden to move forward with the litigation. Beginning with the Second Circuit analysis as recited in *Huntington Beach NAACP v. Town of Huntington Beach,* 844 F.2d 926 (2nd Cir. 1988), the District Court analyzed the facts under the burden-shifting analysis most familiar in employment cases. The District Court held that because the District

---

[2] As a part of a Third Amended Complaint that the District Court did not allow, the Boykin plaintiffs offered additional evidence of a broader trend of gentrification in the areas in question. *See* Brief at pp. 3-4.

presented minimal evidence indicating that because of budgetary constraints the

District was forced to make policy choices on how best to use its limited resources,

it was justified in making the decisions that resulted in the closure of the shelter. *Id*

at 11-14.

The evidence upon which the District Court's conclusion was based was

limited to an isolated conclusory statement from a District official from a prior

litigation and was absent any specific evidence of budgets at any relevant time

period or other related data on placements, cost of placements and availability of

placements in PSH for a relevant time period, nor any standards for placement nor

standards for the awarding of contracts to provide services. To counter this point,

the Boykin plaintiffs argued that the analysis, or conclusion, that the policy choice

was legitimate was erroneous under the facts and circumstances already of record.

After crediting the District's evidence, the District Court concluded that the

District met its burden under the Second Circuit test.

The District Court reached a similar result under the Seventh Circuit test as

applied in *Metropolitan Housing Development Corp. v. Village of Arlington*

*Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025 (1978).

Under this four part test, the District Court found that the Boykin plaintiffs had not

made any showing of each factor: the District Court found the statistical evidence

of discrimination, at best, weak; there was no intentional discrimination; and that

21

the District's policy interest in shifting its resources from low barrier shelters to permanent supportive housing was strong and weighed heavily in favor of the defendants. Thus, the District Court awarded judgment to the District defendants.

## ARGUMENT

A)    The District defendants did not meet their burden to be awarded summary judgment in proving that the PSH program did not have a disparate impact on the overwhelmingly African-American homeless population in the District of Columbia.

Standard for Summary Judgment:

Grants of summary judgment are reviewed *de novo*. Central to this Court's determination is, after reviewing the evidence in a light most favorable to the non-moving party, whether no material issue of genuine facts exists as a matter of record, and that the moving party is entitled to judgment as a matter of law. *See Fed. R. Civ. P.* 56 (c), *Aka v. Washington Hospital Center,* 156 F.3d 1289 (D.C. Cir. 1998)(*en banc*). "[S]ummary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The first analysis used by the District Court that employed the familiar burden shifting test of *McDonnell Douglas v. Green,* 411 U.S. 792 (1973) in the context of disparate impact theory under the Fair Housing Act. Under this test, plaintiffs must first show some form of disparate impact, either disparate effect or

22

segregative effect. *Tenants' Association of 2922 Sherman Avenue v. District of Columbia ,* 444 F.3d 673 (D.C. Cir. 2006). Upon making such a showing, the defendant may then assert some non-discriminatory justification for the action for which no less discriminatory means is available. Some courts would place the burden of proving "no less discriminatory means" on the plaintiffs. while others, including a case principally relied on by this Court in defining disparate impact, would leave the burden of proving "no less discriminatory means" on the defendant. *Compare Gallagher* v.*Magner,* 619 F.3d 823, 834 (8th Cir. 2010) (same), and *Graoch Assocs. #33, L.P.* v. *Louisville/Jefferson Cnty. Metro Human Relations Comm'n,* 508 F.3d 366, 374–78 (6th Cir. 2007) *with Huntington Branch, NAACP* v. *Town of Huntington,* 844 F.2d 926, 939 (2nd Cir. 1988), aff'd, 488 U.S. 15 (1988) (per curiam) *Mt. Holly Gardens Citizens in Action,Inc.* v. *Twp. of Mount Holly,* 658 F.3d 375, 382 (3rd Cir. 2011) *also see* "U.S. Dep't of Housing and Urban Development, Implementation of HUD's Discriminatory Effects Standard: Final Rule" *Fed. Reg.* Vol. 70, No. 32; 24 CFR 100.500(c) (Feb. 15, 2013)("HUD Reg.") at pp. 11462-63. Consistent with the Second Circuit's application that inheres the broader remedial purpose that underlies the FHA, and that there is no required showing of the intent to discriminate, the latter is the better fit for disparate impact analysis. *Huntington Beach, NAACP, supra.*

23

A legally sufficient justification cannot be based on conclusory statements or conjecture unsupported by evidence.  Unlike Title VII, under Title VIII, or the FHA, a legally sufficient justification must be "supported by evidence and may not be hypothetical or speculative."  24 CFR Sect. 100.500 (b)(2), HUD Reg. at p. 11482. The proof of justification requires evidence  "that its actions furthered, *in theory and in practice* (emphasis added), a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Tenants' Association of 2922 Sherman Avenue v. District of Columbia*, 444 F.3d 673 (D.C. Cir. 2006) *discussing  Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d at 935-936.

Again borrowing from case law under Title VII, under this standard plaintiffs may avoid summary judgment in those instances when the record as a whole casts doubt as to the credibility of a defendant's proffered non-discriminatory reason for pursuing the complained of action. *Aka v. Washington Hospital Center,* 156 F.3d 1284, 1289 (D.C. Cir. 1998) *discussing Saint Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993). The issue then becomes whether a reasonable jury could find in plaintiffs' favor based on all the evidence, including "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the [government's] proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as

independent evidence of discriminatory statements or attitudes on the part of the [defendant])." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (*quoting Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). Again, the review by this Court considers the record as a whole.

I.     The Boykin plaintiffs established a *prima facie* case of disproportionate and segregative effects.

Under the FHA, plaintiffs may proceed under two distinct theories of disparate impact: disproportionate effect or segregative effect. Under the first theory, plaintiffs must prove that any given neutral policy or act actually disproportionately affected a protected class. *Tenants' of 2922 Sherman Avenue, supra.* To prove a segregative effect, plaintiffs must show that a policy "perpetuates segregation" and thereby frustrates or prevents inter-racial association. *Metro. Hous. Dev. Corp.* v. *Vill. of Arlington Heights,* 558 F.2d 1283, 1290–91 (7th Cir. 1977).

Disproportionate Effect

Within their theory of disproportionate effect the Boykin plaintiffs argued that the District's policy of closing shelters to move to a system of permanent supportive housing had an adverse disproportionate effect on African-Americans. The Boykin plaintiffs argued that following the closing of the remaining two low-barrier shelters in Northwest Washington, D.C., Franklin Shelter and La Casa

25

Shelter, available shelter space in the Northwest quadrants of the city went to zero thus reducing the amount of shelter space throughout the city. These closings rendered the remaining shelters over-capacity and unsafe while denying shelter to some. The Boykin plaintiffs looked to evidence submitted by the District defendants that indicated that 87.2% of homeless population in the District is African-American as compared to this population comprising 52% of the total population. Def. s' Stmt. of Mat. Fact, para. 5. The record contains further evidence that for the relevant time period the number of homeless persons in the District continued to rise and that any efforts to place persons in PSH did not begin to meet these ever increasing needs. All told, and based on the elimination of all available shelter space in these western quadrants of the city that affected the total amount of homeless shelter space, the policy as practiced by the District defendants had an adverse disproportionate effect on the African-American and Hispanic men.

The critical distinction is the loss of shelter space, or housing, utilized by a population that is overwhelmingly African-American. In *The Tenants' Association of 2922 Sherman Avenue v. District of Columbia, supra,* this Court analogized an action brought by a failure to hire a single person premised on a test that had a disparate impact on a protected class. *See Griggs v. Duke Power Co.,* 404 U.S. 421 (1971). In the context of the FHA, this Court stated:

26

"…To prevail, such an individual would need to show not that her failure to obtain the job disproportionately affected her protected class (such an inquiry would make little sense where the employer's action affected only one person), but rather that the test itself had a disproportionate effect on the protected class…"

*The Tenants' Association of 2922 Sherman Avenue,* 444 F.3d at 680-81. Thus, in this case it was not just the closing of La Casa Shelter that affected 90 beds, or a "limited subset" of homeless persons. Instead the Boykin plaintiffs complained of and offered proof that a broader policy whose operation denied housing to a class of persons that were 87.2% African-American of which the closing of La Casa was a part. This was not the "analytic cherrypicking" described by the District Court. Even so, the closing of low-barrier shelters, the Boykin plaintiffs continued, denied housing and strained resources to untenable lengths. But in this case, the District Court failed to recognize the theory upon which the Boykin plaintiffs articulated and the underlying premise of their theory of disparate effect.

The District Court's primary complaint on this theory was that the Boykin plaintiffs failed to set out facts indicating that the general policy in question resulted in a denial of shelter in the city as a whole. The District Court looked to evidence proffered by the District defendants to the effect that the closing of the shelters in tandem with the purported increased placements in PSH made 600 beds available despite the loss of the 390 beds occasioned by the closing of La Casa and Franklin shelters. The District Court further concluded that the closing of La Casa,

27

as an isolated event, was not significant in its impact on those individuals effected as a part of the entire homeless population of the District and that, in any event, the Boykin plaintiffs offered no evidence indicating its broader adverse effects. In both respects the District Court erred.

Throughout the litigation the Boykin plaintiffs complained of and presented evidence that that the homeless services system failed to meet the growing needs of the District's homeless population. And despite any placements in PSH, the closing of shelters only worsened conditions in the entire system. *See* Part A, II below. Considering the record as a whole, as this Court must do in in its *de novo* review, the record contains ample evidence both supporting the Boykin plaintiffs' assertions as fact as well as controverting the District's proffered declaration that the shelter closings in some way benefited the homeless population. The fact remained clear that closing La Casa Shelter removed ninety (90) beds from the system, thus reducing available space by at least 10%, and when considered with the closing of Franklin Shelter, the available space was reduced by a total of three hundred and ninety (390) beds, or by one third. When considered within the total scheme of available shelter housing, the effect was indeed significant and adverse.

"Segregative Effect"

A second theory upon which the Boykin plaintiffs proceeded was that the policy of closing low barrier shelters "perpetuates segregation and thereby prevents

28

interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups." This theory relied on evidence indicating a persistent pattern of segregation that was historical and resulted in the division of areas and neighborhoods based on protected classifications. *Huntington Branch NAACP,* 844 F.2d at 938. As a part of this theory, the Boykin plaintiffs presented evidence of a shifting racial demographic as the areas where these shelters were located were central to the gentrification taking place in the District. Indeed, as the *Huntington* court commented, preventing the segregative effect of a given policy advances the primary purpose of Title VIII: to promote open and integrated housing patterns. *Id.*

In *Huntington Branch, NAACP*, *id.,* the court found a segregative effect based on statistical evidence. First the court found that a policy goal that would integrate one neighborhood that was 98% white with low income and section 8 housing would be impeded by a policy that restricted multi-family housing to a predominantly minority area. The court further based its finding of segregative effect on the statistics that indicated that a disproportionate number of persons using subsidized housing were minorities, and that there was a shortage of housing affordable to low and moderate income residents in the area. These facts presented a *prima facie* case of "segregative effect."

29

The statistical evidence in this case mirrors the statistical evidence presented in *Huntington Beach, NAACP.* First, the Boykin plaintiffs presented evidence showing the racial composition of those census tracts contiguous to the locations of the two closed shelters. Those tracts comprising the area of La Casa Shelter revealed racial patterns of equal numbers of black and white residents, while the areas in the remaining shelters that were left open were, in most cases, over 90% black. Added to this data was census information that revealed a pattern of gentrification in the area around La Casa Shelter with increasing numbers of whites entering the area and a commensurate decrease in the numbers of black residents. Equally so, it undisputed that the male homeless population in the District is well over 80% black and, as a group, were more likely to utilize any low-barrier shelters in the District.

Even so, the District's records indicate similar housing patterns in placements in PSH. As a part of the record evidence, despite the construction of 45 units of permanent supportive housing on the site of La Casa, of the 350 placements through the PSH program, less than 10% were made outside of Wards 5, 7 and 8, and none were made in Wards 2 or 3 in those areas west of Rock Creek Park. Even though the District Court considered the evidence of the placement of Franklin residents irrelevant to this case, this was error because the District Court failed to recognize that the closing of Franklin was a part of the same policy or

pattern at issue and was as much a part of the displacement as was the closing of La Casa.

Drawing from the shifting demographic trends and the proportionate effects on the homeless population by the closing of the remaining two shelters in the Northwest sections of the city, the Boykin plaintiffs presented a compelling statistical picture of an ongoing pattern of segregation. Indeed, courts reject any bright line test for statistical significance and must consider the surrounding facts on a case-by-case basis. *Chin, et al., v. Port Authority of N.Y. and N.J.,* 685 F.3d 135 (2nd Cir, 2012)(rejecting the 5%, or two standard deviation, rule as a bright line test for disparate impact under Title VII, instead considering any statistical analysis with the surrounding facts) *citing Segar v. Smith,* 738 F.2d 1249, 1283-84 (D.C. Cir. 1984); *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 995 n.3 (1988) ("[W]e have not suggested that any particular number of 'standard deviations' can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination. . . .") *but see Stout v. Potter,* 276 F.3d 1118 (9th Cir. 2002) *cf State of Arizona v. City of Cottonwood,* CV-11-1576 (DAZ 2012). But here the District Court concluded that absent any actual numbers of homeless persons now living in the respective wards, the closing of La Casa Shelter was not "statistically significant." The District Court reached this conclusion absent any analytical framework, let alone expert statistical analysis as would have been

31

required at this stage of the proceedings. But even more, the District Court's conclusion confuses the point. As articulated above, the issues in this case turn on the loss of housing in gentrifying areas and not the numbers and location of homeless persons living on the streets. Contrary to the District Court's conclusion, the Boykin plaintiffs presented a compelling case of "segregative effect."

At this stage of the proceedings, and considering the evidence in a light most favorable to the non-moving party, the District court erred in finding no segregative effect.

II.    Contrary to the District Court's conclusion, the closing of low-barrier shelters caused an adverse impact on a protected class, and the Boykin plaintiffs raised a material issue of fact as to the credibility of the District defendants' proffered legally sufficient justification.

Other evidence of record indicates not only the significance of the loss of housing, but also the adverse effects this loss occasioned on this protected population. First, attached as exhibits to the Boykin plaintiffs Second Amended Complaint are numerous declarations from former La Casa residents who indicated conditions far less amenable than what the District defendants would have a finder of fact believe. See "Second Amended Complaint" Docket #74-1, App. 16. Contrary to the District Court's reading of the record, of the forty four declarations that are a part of the record nine men indicated obtaining shelter in one of the District's remaining shelters. Many of the others reported living on the streets in

32

the Columbia Heights/ Mount Pleasant areas of the District. Of the nine who reported receiving shelter when available along with some of the others who did not, all reported overcrowded, unsanitary and unsafe conditions at the remaining shelters. In many instances, these declarants swore to an inability to obtain shelter space and being forced live on the streets or moving from shelter to shelter, staying at one or another when they were able to do so. None of the former La Casa residents reported obtaining any housing through PSH. *Id.* Standing alone, the anecdotal evidence of those directly affected by the closing creates material issue of fact and undermines the District Court's reading of the evidence.

Second, these declarations were corroborated by reports from The Washington Legal Clinic for the Homeless ("WLCH") and Urban Institute that were filed as a part of the Motion for a Temporary Restraining Order and the Second Amended Complaint and were considered by the District court. Docket Entry 71, Exhibit 1; Doc. 11-6, Exh. 4, App. 8. [3] WCLH reported that for this same

---

[3] These reports should considered admissible evidence under FRE 807. Because these reports were prepared by a public interest groups charged with monitoring issues with the homeless population in the District, contains factual reports concerning the number of homeless and those relevant conditions at the District's homeless shelters and are not offered for any opinion and are independently corroborated they have those traditional guarantees of trustworthiness. Further, these reports were offered for information that could not have been obtained through other means, are based on otherwise admissible reports and are material and relevant to contested issues in the case. At this stage of the proceedings, the

relevant time period of the broader homeless population that included homeless
individuals, fifteen percent (15%) of the respondents in an April 2009 survey said
they were forced to sleep on the streets due to shelters being full, and 40% refused
to enter shelters due to overcrowding.  On average, homeless individuals were
turned away from emergency shelter 25 times each night. *WLCH, Homelessness
and Poverty, Washington, DC* (2009) at 3-4 (hereinafter "*WLCH Report*")
http://www.legalclinic.org/about/facts/asp), Docket  # 11-6 "Exh. 4 Pl.'s Mot for
Temp. Restraining Order," App. 8.

    The record indicates that the number of homeless persons has risen steadily
since 2009 while the public shelter space has declined. WLCH further reported that
approximately 16,000 people were homeless in Washington DC over the course of
a year, one of highest rates in the country. *See  WLCH Report* at pp1-2, App. at  8.
On January 27, 2010, the year La Casa Shelter was closed, 6,539 literally homeless
persons were counted in the District in the then most recent Point in Time Study.[4]
This was an increase of 5% from the Point in Time Study conducted in2009. "Point

---

interest of justice would be better served by considering the reports for their full
evidentiary value.

    [4] Even so, the Boykin plaintiffs also submitted as evidence a report from the
Government Accounting Office that described circumstances that lead to the
uniform undercounting of the homeless in any jurisdiction. The District was not
immune to this undercounting.

In Time Enumeration," Docket # 78-5, App. 5. The WLCH also reported that, for most applicants the wait for emergency family shelter was approximately six months and that there was in excess of four hundred families on the wait list for emergency shelter, with the numbers increasing daily. *WLCH Report* at p. 2, App. 8. This is relevant because homeless families are also considered for placement in the PSH program. According to the WLCH report, as of October 2009, at least 15,411 households remained on the wait list for DC Housing Authority's Public Housing and 26,704 households on the wait list for Housing Choice Voucher Program, 13,000 of whom are homeless. The number of public housing units in the District has decreased by 4000 units since 2000, and was to continue to decrease, with at least 68% of all project based subsidized units set to expire by 2023. *WLCH Report* at 3-4.

The Urban Institute reported that prior to closing La Casa, at least 13,000 single adults and 2,800 adults and children use emergency shelter in the District every year. *Major Recommendations:  Summary Report of the Urban Institute's Assessment of the District of Columbia's Public Homeless Assistance System*, June 2, 2008 at page 2 (hereinafter "*Urban Institute Report*"), App. 9. And even though the Urban Institute recommended a shift to PSH, this recommendation was predicated on the understanding that the District defendants would have adequate

PSH housing in place before any shelters were closed. The District defendants never came close to meeting these aspirational objectives.

Further, of record are the minutes from The Inter-Agency Council on Homelessness (ICH) held on February 25, 2009, where Fred Swan, the District defendant's declarant in this case, reported that over 3,100 homeless singles and over 360 homeless families had completed assessment forms in efforts to obtain Permanent Supportive Housing, but only 414 singles and 1 family had been housed. "ICH Meeting Minutes, Feb. 25, 2009," Pl.'s Mot. for TRO, (10/21/10) Docket# 11-2, App. at 10. When contrasted with the declaration of Fred Swan submitted by the District defendants in support of their Motion for Summary Judgment, the number of placements in PSH attested to only indicates a widening gap between available housing and the growing number of homeless. The proffered declaration is, at best, disingenuous.

Indeed, The evidence in the aggregate permits a reasonable trier of fact to find a pattern of discrimination against the homeless population by the District, providing "ample proof" even at this stage of litigation that many Blacks, Hispanics, and disabled lived in the shelters, are at highest risk of becoming homeless in the District, and fall into the category of 20% and 60%  AMI, which was removed from the affordable housing requirements for Donatelli's luxury

36

apartments, where the former La Casa Shelter was located. *United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1186 (8ᵗʰ Cir. 1975).

Finally, the Boykin plaintiffs submitted a declaration from a court monitor in another cases in the United States District Court for the District of Columbia that controverted and contradicted those assertions made by Fred Swan, the District's affiant in the declaration used by the District Court to support its grant of summary judgment. In this declaration, the District's official admitted to the economic realities that it would be impossible for the District to meet the needs of persons suffering from mental disabilities as required by a consent decree because this would require an "inexhaustible supply" of low income housing that is not available. *See* See Decl. of Stephen T. Baron, Director of DMH, at pages 9-10 in Civil Action No. 74-385 (TFH), Memorandum in support of motion to dismiss, filed Sept. 4, 2009 (Excerpts provided as Pl. Ex. 5), App. 11.

III.  The District defendants did not prove a legally sufficient justification such that a reasonable jury could not find for plaintiffs.

a) The District Defendants' Proffers of Legally Sufficient Justification:

The District defendants, on the other hand, submitted reports that corroborate important aspects of the evidence submitted by the Boykin plaintiffs. In the first report The Community Partnership for the Prevention of Homelessness ("The Partnership") admits that the number of homeless persons residing in low-

barrier shelters rose 5% from 2009 to 2010. The Partnership also reported an increase in the number of "unsheltered" homeless, or persons living on the street, for the same 2010 time period to four hundred and thirty (430) men and women. The report goes on to state that but for the addition of some 80 single PSH units and 50 family PSH units the emerging crisis would have been worse. "Def. Exh. Sum. Judg." Docket Entry, 78-5, App. 5.

In the second report submitted by the District defendants, a budget report to the United States Congress, states a surprising decrease number of homeless residents from 2008 to the time of the 2010 count. Absent from the budget report is any mention of the number of unsheltered homeless persons in the city. Also contained in the report are budgetary estimates for two projects in the city, one at the La Casa site. But not included in the report is any mention of the costs associated with the operation of low-barrier shelters. Indeed, absent from all of the evidence submitted by the District defendants is any mention of the costs of low-barrier shelters, either of those that remained open or those that were closed, or any comparison indicating a cost-saving that would justify the closing of low-barrier shelters.

The District's proffered evidence or the analysis advanced by the District Court does nothing to address the rise in the total number of homeless persons in the District, its effect on the total system or the corroboration of the anecdotal

38

accounts from former La Casa residents of what followed the closing of La Casa

Shelter. Material issues of fact exist in the record.

> b)  The District's legally sufficient justification does not support
>     summary judgment:

The conclusory and unsupported assertions of "policy choices" do not meet

the standard articulated above for proving some legally sufficient justification for

policies that adversely affected a protected class of persons. To restate the standard

to be applied: once a prima facie case of disparate effect is shown, the burden then

shifts to the defendant to prove a justification for its actions. Should a defendant

fail to prove that no material issue of fact exists as to any justification, then a

determination must be made as to the existences of any less discriminatory

alternative. Under the *Huntington Branch NAACP,* the burden to prove that no less

discriminatory alternative exists remains with the defendant. Further, this inquiry

includes a review as to the credibility of any justification, or the legitimacy of any

claimed practice. *Aka v. Washington Hospital Center,* 156 F.3d 1284, 1289 (D.C.

Cir. 1998) *discussing Saint Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993).

If there is any reason for a court not to find a reasonable legally sufficient

justification, then the inquiry is ended and summary judgment must be denied.

This includes the raising of a material issue of fact.

The record indicates that material issues of fact were raised as to the credibility and practice of the District defendants' claim of justification. The circumstances reported both prior to and following the closing of the both La Casa Shelter and Franklin Shelter, whether considered together or apart, indicate that the District defendants' assertion that any result was a "net gain" or advantageous to this protected class is both conclusory, not supported by any evidence and is contrary to a factual record that was established in this case. With or without any placements in PSH housing the loss was over 340 beds for homeless men created further strain on a housing program that is intended to serve the entire homeless population. All of the evidence points to an increase in the number of homeless persons in the District, both single men and women and families, eclipsing all available services. At this stage, the District defendants attempted to show that there were no adverse effects from its policy as implemented. They failed to do so. Even more, the record further indicates that the policy in practice did not establish a legitimate justification for the policy as a whole.

Indeed, the District's evidence does not contain anything beyond conclusory assertions unsupported by facts. In the declaration of Fred Swan or those other reports submitted by the District defendants, evidence relied on by the District Court, there is no evidence detailing the cost per unit of PSH, no evidence of the cost of operating a shelter or how the two programs are mutually exclusive. Also

absent is any indication of what effects the bare assertion of a dollar amount would have on the system as a whole. The declaration and reports only provide a number of placements that, when contrasted with other evidence, evinces a widening gap between resources and needs. It remained the District defendants' burden to prove the efficacy of these bare assertions such that a jury could not find for plaintiffs. They failed to so.

As a justification, the District defendants claimed that the closing of the shelters was a part of an effort move from low barrier shelters to a system of permanent supportive housing. For many of the same reasons articulated in the evidence above, this policy was not legitimate under the circumstances and left the system in dysfunction, unable to meet the growing demands of this protected population. Despite the District Court's conclusion, a material issue of fact exists as to the credibility and legitimacy of the District defendants' claimed justification.

IV.     The District defendants did not meet their burden in proving that no less discriminatory alternative existed.

Following the analysis applied by the Second Circuit in *Huntington Beach, NAACP, supra,* it remains the District's burden to prove the lack of any less discriminatory alternative. This standard is predicated on the understanding that different from the typical Title VII burden-shifting framework that inheres the element of intentional discrimination, disparate impact analysis under the FHA

41

does not require a showing of intentional discrimination. Thus, by leaving this burden with the defendant the broader remedial purposes of the FHA are furthered. *Huntington Beach, NAACP,* 844 F.2d at 939.

The District Court adopted this reading that required defendants to prove that no less discriminatory alternative was available by relying on *Huntington Beach, NAACP* in its analysis that denied the District defendants' motion to dismiss and in the text of its opinion granting summary judgment. But in the end the District Court held the Boykin plaintiffs to this burden. Even so, a split exists within the circuits as to which party bears the burden on this issue. Added to the confusion is HUD's recent formulation of disparate impact that would place the burden on plaintiffs to prove no less discriminatory alternative. [5] And despite its "hints" that the Second Circuit formulation would apply in the District, the issue remains undecided in this Circuit.

Neither the District defendants' evidence nor the record as a whole present any evidence that no less discriminatory alternative was available. First, in support

---

[5] *Compare Mt. Holly Gardens Citizens in Action, Inc.* v. *Twp. of Mount Holly,* 658 F.3d 375, 382 (3rd Cir. 2011) (burden of proving less discriminatory alternative ultimately on plaintiff), *and Gallagher* v. *Magner,* 619 F.3d 823, 834 (8th Cir. 2010) (same), *and Graoch,* 508 F.3d at 373–74 (same), *and Mountain Side Mobile Estates v. HUD,* 56 F.3d 1243, 1254 (10th Cir. 1995), *with Huntington Branch,* 844 F.2d at 939 (burden of proving no less discriminatory alternative exists on defendant) and 24CFR 100.500(c).

of its justification the District proffered the conclusory and irrelevant statement that the closing of the shelters was the result of budgetary decisions, or "policy choices," that were a part of a policy shift from providing low-barrier shelter to one of permanent supportive housing. But in making this vague and conclusory assertion the District did not offer any particular evidence supporting this statement: they did not provide any evidence of the cost of operating any low-barrier shelter, and did not present any evidence of the possible cost of operating and maintaining a PSH system for the growing numbers of homeless persons and families in the District. Because of this failure in the evidence it is impossible to say whether the District defendants ever considered, let alone acknowledged, the existence of less discriminatory alternatives.

Even so, the record evidence discussed above reveals a pattern of placement in both the PSH program that belies any effort to proceed in a less discriminatory manner with the locations of the only remaining low-barrier shelters and the overwhelming proportion of placements occurring in those areas of the city that remain overwhelmingly African-American and underserved. Indeed, in their complaint the Boykin plaintiffs alleged that the District defendants refused to consider alternatives to abate the crisis in the shelter system by refusing to open a shelter in city-owned property on Spring Road in Northwest Washington or to re-open Franklin Shelter. The District Court acknowledged the "compelling point"

43

that leaving shelters open while making PSH placements were not mutually
exclusive, but concluded that the Boykin plaintiffs offered no evidence in support
of this assertion.  Mem. Op. (9/30/13) at pp. 21-22, App. 2. The District
defendants, however, offered no evidence to the contrary, nor any other relevant
basis that no alternative existed.  The District defendants did not offer any
explanation based in evidence for not making any placements in other parts of the
city, closing those shelters in the underserved areas of the city instead of the ones
that were closed, or their refusal to make efforts to abate the crisis by opening
shelters at the aforementioned locations. Under *Huntington Beach, NAACP, supra,*
it remained the District defendants' burden to do so. For these reasons this Court
must reverse the District Court's grant of summary judgment in favor of the
District defendants.

Given the state of record, the state of the law and posture of the case when
summary judgment was granted, the record on this issue was far from fully
developed. The facts that are of record leave more questions than answers on what
can be gleaned as a contested issue in this case. Indeed, as in *Mt. Holly Gardens
Citizens in Action,Inc.* v. *Twp. of Mount Holly,* 658 F.3d 375, 382 (3dCir. 2011),
where the ruling on summary judgment was premature based on an incomplete
record absent full discovery,  this case should be remanded so that discovery can

be completed and any decision on summary judgment can be based on a fully

developed record once the law in this Circuit has been clarified.

B)      The District Court erred in dismissing the Boykin plaintiffs' counts alleging
        intentional discrimination under the Fair Housing Act. Based on the
        statistical evidence that reflected the demographic make-up of the areas of
        the city-run shelters, the Boykin plaintiffs alleged a prima facie case of
        discrimination that went without reasonable justification.

In *The Tenants' Association of 2922 Sherman Avenue v. District of*

*Columbia*, 444 F.3d 673 (D.C. Cir. 2006), this Circuit adopted the familiar Title

VII burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S.

792 (1973). The analysis, though similar with disparate impact, differs in that a

defendant's motivation is at issues regardless of effect, while under disparate

impact intent is not an issue. As in *Sherman Avenue,* the analysis is twofold: 1) the

Boykin plaintiffs must first establish some evidence from which an inference of

intentional discrimination may be drawn, and if sufficient, then 2) a finder of fact

must be allowed to determine if an asserted defense of justification was a pretext

for discrimination. *The Tenants' Association of 2922 Sherman Avenue v. District of*

*Columbia*, 444 F.3d at 682.

At issue in *The Tenants' Association of 2922 Sherman Avenue, supra,* was

whether a District policy that resulted in the closure, or attempted closure, of

building in predominantly Hispanic sections of the city was disparate treatment

under the FHA. The enforcement actions taken against these buildings were

45

compared to buildings with similar violations in other parts of the city in which no enforcement action was made by the District. This Court held these facts sufficient to prove a *prima facie* case disparate treatment. The Court further considered the District's failure to articulate any basis or rationale for the distinctions along with the apparent divergence from prior practice as proof of pretext for the proffered justification of the District's interest in ensuring the safety of the tenants.

The facts of record in this case are remarkably similar to those present in *Sherman Avenue*. In this case, the remaining city shelters were located in two distinct and racially divided areas of the city. The complaint in this case alleged that the two shelters that were closed were located in predominantly white sections of the city and areas subject to shifting racial demographics, while the shelters that were left open were in overwhelmingly black and underserved areas of the city. The complaint further alleged facts from which it could be inferred that the shelters left open were not in any better condition than those closed and were thus similarly situated. Indeed, the allegations that these shelters were over-crowded and in worsening physical condition. The complaint alleged that the District offered no explanation or rationale for why the shelters in the predominantly white areas were closed while those in the black areas were left open and that all were of an equal size and served equal numbers of persons. And because the allegations described

the homeless population as over 87% black, it could be reasonably inferred that blacks were far more likely to utilize that were closed.

Because of the similarity in the evidence between this case and the controlling precedence of *The Tenants' Association of 2922 Sherman Avenue v. District of Columbia*, 444 F.3d 673 (D.C. Cir. 2006), the Boykin plaintiffs established a case sufficient to survive a motion to dismiss the complaint. In this case, the Boykin plaintiffs plead statistics that indicated that a population that is over 87% African-American was systemically denied housing in areas of the city that were more white than those areas of the remaining shelters. The statistics showing that the homeless population was over 80% African-American alleged by the Boykin plaintiffs more than established an inference of intentional discrimination. Also contained in the complaint is the racial composition of the individual plaintiffs, all of whom were former residents of La Casa Shelter. *See* "Pl.'s Mot. for TRO" at p. 15, Docket #11, App. 17.  Along with the specific information as to the race of each defendant numbering over forty (40) it could be easily inferred, and proven with discovery, that the racial make-up of La Casa was predominated by a protected class. When combined and compared with the racial demographics of the remaining shelters and those that were closed either individually or taken as a whole, the Boykin plaintiffs more than met their burden of proving a prima facie case. With the clear inference of discrimination

47

established, the Boykin plaintiffs made the prima facie showing and the motion to dismiss should have been denied. *Jackson v. Okaloosa County Fla.*, 21F.3d 1531, 1543 (11th Cir.1991).

The District Court, however, disagreed. In its Memorandum, the District Court concluded that even with the more specific information on the individual plaintiffs the bare assertion of the demographic s of the locations of the shelters was not enough to show an inference of discrimination. *See* Second Amended Compl. at para. 2-43 & Exh. 4, Docket 76, App. 3. The District Court dismissed this evidence because along with the lack of any allegation of direct evidence of discrimination:

> "[Plaintiffs] have not tracked in any meaningful way the dispersal of the individuals who used to populate LaCasa and Franklin. They have made no attempt to consider the locations of and *distribution of* homeless individuals throughout housing facilities other than low-barrier, emergency, men-only shelters. In short, they have failed to engage in any type of analysis capable of demonstrating that the closures of La Casa and Franklin actually had the effect that the plaintiffs claim."

Mem. Op. at p. 12 *citing* Mem. Denying TRO (Dec. 17, 2010) Docket 39 at pp. 8-9. But this type of granular analysis is not required.  It is the rare case indeed where direct evidence of discrimination is available, and, as argued above, this case turns on the denial of housing and not where homeless persons ultimately live on the streets of the District.

Again turning to *The Tenants' Association of 2922 Sherman Avenue*, this was just the comparison employed to show a discriminatory pattern and thus an inference of discrimination. In *Sherman Avenue,* plaintiffs offered evidence indicating that the enforcement of housing code violations was centered in predominantly Hispanic areas of the city as opposed to other less Hispanic areas. The *Sherman Avenue* court never required any evidence of where these populations ultimately resided. Likewise, here the Boykin plaintiffs alleged that while the city operated shelters in both overwhelmingly African-American and non-African American and gentrifying areas of the city, over the course of this shift to PSH the city only chose to close those shelters in the non-African-American and gentrifying parts of the city. The choice of shelters to close went unexplained. As in *Sherman Avenue,* these allegations were more than enough to establish a *prima facie* case of discrimination.  But there is more.

As District Court accounted for but dismissed as irrelevant, the Boykin plaintiffs further alleged that following the closing of Franklin Shelter located in a predominantly white section of the city the limited PSH placements were located in non-white sections of the city. Second Amended Compl. at Exh. 5, App. 3. Even though these placements occurred two years prior to the closing of La Casa, the closing of Franklin was as much a part of the pattern of displacement as La Casa and was a part of and offered as further factual support of an inference of

49

intentional discrimination in this case. Even so, in each of the declarations that were a part of the Boykin plaintiffs' complaint not one declarant attested to receiving any type or form of alternative housing, no matter the location. Of the few who did receive housing, this was in over-crowded and unsanitary shelters located in the eastern quadrants of the city.

As an alternative method to prove intentional discrimination, the Boykin plaintiffs alleged a broad and pervasive pattern of conduct and displacement of groups protected under the FHA. Circumstantial evidence cab be used to establish the requisite intent, and among the factors instructive in determining whether racially discriminatory intent is present, includes the sequence of events leading up to the challenged actions. *See Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025 (1978); *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991).  The pattern of targeting and removal of the largely minority homeless population exhibited by the District defendants include: i)  clear and undisputed pattern of closing all low barrier public shelter services in largely Caucasian Wards 1 and 2 and relegating the remaining public shelters to Wards 5, 7 and 8, with highest minority populations; ii) the Districts use of  pretext of "uninhabitability" used by the District in suddenly evacuating and permanently shuttering Franklin Shelter; iii) the refusal to consider less discriminatory options, including refusal to open a

50

homeless facility that had been approved by DHS in a nearby location, on Spring

Rd., NW and the continued refusal to reopen Franklin Shelter which had

exemplary supportive services located in the shelter; iv) the location of over 90 %

of PSH placements are in Wards 5, 7 and 8, with highest minority populations; v)

the location of the remaining public shelters are in Wards 5, 7 and 8, the lack of

affordable housing in Wards 1 and 2; vi) African Americans and Hispanics are at

the highest risk of homelessness in DC; vii) the removal of affordable housing

requirements for the most needy (20% and 60% AMI) implemented by the Zoning

Board for the Donatelli luxury apartments after conveyance of the La Casa Shelter

land from the District to Donatelli; vii) the Business Interest District representative

from downtown DC (Ward 2), documenting his intention to tighten regulation of

charity groups feeding the homeless in downtown DC, prevent transportation from

the far flung shelters to downtown DC, and to "repurpose" CCNV;  viii) less

discriminatory options were identified by Plaintiffs and repeatedly denied by the

District; ix) the PSH program was not satisfactorily addressing the rising needs of

the homeless in DC, and was used as a pretext to close the public shelters in Wards

1 and 2.

Applying the familiar standard that requires the allegations of facts that

would indicate a cause of action or that, through discovery, could lead to facts that

would prove a case of discrimination, the Boykin plaintiffs more than met their

burden. In this case, the District Court misread what would be required to prove a case of intentional discrimination by requiring the Boykin plaintiffs to prove the physical distribution of the displaced homeless persons. This is not required to prove a case of housing discrimination. Indeed, under either theory articulated above, the District Court erred in dismissing the allegations of intentional discrimination based on race.

C)    <u>Plaintiffs alleged claims cognizable under disabilities discrimination under the FHA. For the same reasons articulated above, the District court erred in dismissing this count of the complaint.</u>

The District Court erred in dismissing the disparate impact and treatment claims based on disability under both the FHA and ADA. As in its ruling dismissing racial discrimination, The District Court stated that factual allegations that would support the "stark" accusation of intentional discrimination based on disability are entirely missing. For many of the reasons stated above, the District Court erred in the area of disability discrimination as well.

FHA to include people with disabilities, it is unlawful:  To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap. 42 U.S.C. 3604(f) *also see Community Services, In., vs. Wind Gap Municipal Authority*, 421 F.3d 170- (2005).  Title II provides that no qualified individual with a disability shall, by reason of such disability, be

52

excluded from participation or be denied benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity. 42 U.S.C. § 12132 *also see Henrietta D. v. Bloomberg*, 331 F.3d 261, 276-77 (2nd Cir.2003). Disparate impact claims are cognizable under the ADA. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2002).

The seventh circuit held that the duty of reasonable accommodation is limited to rules, policies, practices, or services that hurt handicapped people by reason of their handicap, rather than that hurt them solely by virtue of what they have in common with other people, such as a limited amount of money to spend on housing. *United States v. City of Chicago Heights*, 161 F.Supp.2d 819, 835 (N.D. Il. 2001). Here the shelter closings are actions that hurt people by reason of their handicap, estranging them from vital services linked to their handicaps. Boykin plaintiffs provide compelling evidence that the requested accommodation was both reasonable and necessary, since infrastructures of vital accompanying services had been soundly established in both Columbia Heights, very near to La Casa Shelter, and in Franklin Shelter. The concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability. *City of Chicago Heights*, 161 F.Supp.2d at 834 *citing Bronk v. Ineichen*, 54 F.3d 425, 429

(7th Cir. 1995). Boykin plaintiffs provided evidence of the deleterious effects of La

Casa's closing on their health and ability to get reasonable access to vital services.

    As in the case of racial discrimination, statistics to prove discrimination

come in infinite variety and their usefulness depends on all of the surrounding facts

and circumstances. *Gallagher v. Magner*, 619 F.3d at 837, *quoting Int'l*

*Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340 (1977). To show

disparate impact, plaintiffs must demonstrate that a facially neutral policy or

practice has the effect of discriminating against a protected class of which the

plaintiffs are members. *Graoch Assoc. #33, L.P. v. Louisville/Jefferson Cnty.*

*Metro Human Relations Comm'n*, 508 F.3d 366, 371 (6th Cir.2007). And where

such claims involve housing, courts have applied the same analysis used for

disparate impact based on disability under the FHA. *Tsombandis v. West Haven*

*Fire Dep't.* 352 F.3d 565, 574-78 (2nd Cir. 2003). The FHA is violated when a

municipality refuses to make reasonable accommodations when the

accommodations may be necessary to afford handicapped persons equal

opportunity for housing. 42 U.S.C. sec 3604(f)(3)(B). Whether a city will have to

alter its policies to accommodate the handicapped is a question where answers will

vary depending on the facts of a given case. *Turning Point v. City of Caldwell*, 74

F.3d 941, 953, 954 (9th Cir. 1996) *citing City of Edmonds v. Washington State*

*Building Code Council*, 18 F.3d 802 (9th Cir. 1994).

Accordingly, as alleged in the Boykin plaintiffs' complaint the homeless population in DC comprises a significant number of disabled. *The Greater D.C. Cares Factsheet* describes 71% of homeless individuals and 53% of persons in homeless families living in DC as suffering from either substance abuse or a mental illness. *D.C. Cares Fact Sheet* at p. 2, App. 15. The *District's Consolidated Plan, FY 2006*, reported that 36% of individual homeless suffer from chronic substance abuse, 19% are seriously mentally ill, 16% are dually diagnosed, and 12% are living with HIV/AIDS. "Consolidated Plan 2006" Docket 84-1, App. 18. *The Community Partnership for the Prevention of Homelessness Published Fast Facts on Homelessness in D.C. 2008* reported that among single homeless persons in Emergency Shelter 26.6% have chronic health problems, 34.5% are chronic substance abusers, 2 % are living with HIV/AIDS, 23.1% are physically disabled, and 18.9% are severely mentally ill - only 9.2% of the population reported no disability. "Published Fast Facts," Docket 85-1, para. 121.

While the District Court in the instant case was persuaded by the decisions holding that specific allegations about the limitation of a major life activity caused by plaintiffs' impairment are not required to survive a motion to dismiss, the declarations of record describe a multitude of disabilities that significantly limit former shelter residents mobility, as well as a number of disabilities which increase difficulty to reach services in distant parts of the city. Mem Op. (10/4/12) at p.

*citing Fowler v UPMC Shadyside*, 578 F.3d 203, 213-14 (3rd Cir. 1998)(*collecting cases*) App. 1. These declarations describe conditions including diabetes, impaired vision, pneumonia, gout, COPD, severe depression, schizophrenia, bipolar disorders, and Hepatitis C. Also described in these declarations are overcrowded and dangerous conditions at remaining shelters, the inability to meet medical and mental health care appointments, and hospitalization resulting from leg injuries from walking to another shelter after the closing of La Casa.

As further allegations, the Boykin plaintiffs point facts and circumstances that raise issue with the District defendants' policies and whether they meet the requirements under the FHA and ADA. For instance, the evidence of record clearly shows that effective mental health services serving the plaintiffs had been established in the Columbia Heights area from which Plaintiffs have been displaced. Some former La Casa residents include a significant population of Hispanic men suffering from some cognizable disability. *See* "Excerpts from State of Latinos in DC," Pl.'s Sec. Amended Compl., Exh. 11 , Docket #74-2  App. 19. Columbia Heights and the general area of north Ward 1/south Ward 4 is well known to host a thriving Hispanic community, offering services which overcome language barriers that former La Casa residents now must face upon their displacement to Wards 5 and 8. The District admitted this in its pleadings in support of its motion to vacate a December 12, 2003 Consent Order and to dismiss

action for violating the Erwin Act by failing to provide community based

alternatives to institutionalizing the mentally ill.  See Decl. of Stephen T. Baron,

Director of DMH, at pages 9-10 in Civil Action No. 74-385 (TFH), Memorandum

in support of motion to dismiss, filed Sept. 4, 2009 (Excerpts provided as Pl. Ex.

5), App. at 11.

> "…In FY 08, DMH awarded a contract to Catholic Charities at
> Hermano Pedro Day Program, located in the Columbia Heights area
> of the District, to increase services to homeless individuals.  As
> required by Exit Criteria 13 and 16, DMH memorialized its strategy
> for serving the homeless and mentally ill in a plan, which was
> approved by both the Court Monitor and the Dixon plaintiffs' counsel.
> As a result of all of these services, exit Criteria 13 and 16 relating to
> homeless services have been moved to inactive status…"

The allegations show that the Boykin plaintiffs had routinely received

supportive services (health care, mental health care, counseling at Hermano Pedro

and Neighbors Consejo, both within three blocks of La Casa Shelter. Second

Amended Compl.  Pl. Ex. 2, App. 3. Franklin Shelter also had an exemplary

program through Catholic Charities prior to its closing, with supportive services in

the shelter.  The evidence also shows that the Boykin plaintiffs are now forced to

choose between sleeping on the streets in the areas from which they have been

displaced, or walking long distances in order to attempt to continue receiving

mental health and other services provided in the Columbia Heights/Mt. Pleasant

area.  See Pl.' s Declarations, Pl.'s TRO Docket #s 1,2 and 4, App. 16. The net

effect of the closings was to deny services to this population in violation of applicable law.

## CONCLUSION

For the foregoing reasons and arguments, this Court should vacate the orders ranting summary judgment and dismissing other related counts in this case, and remand the case to the United States District Court so that the litigation may then proceed.

Respectfully submitted,

_____/s/_____

GEORGE E. RICKMAN
DC Bar 433298
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
georgerick11@comcast.net
*Counsel of Record for Appellants*

_____/S/_____

JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC  20012
202-483-9303
jjzara@aol.com
*Counsel for Plaintiffs*

## CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(c), I certify that the foregoing brief

contains 1385 words excluding the parts of the brief exempted by Fed. R. App. P.

32(a)(7)(B)(iii).


_____/s/_____
GEORGE E. RICKMAN
DC Bar 433298
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
georgerick11@comcast.net
*Pro Bono Counsel of Record for Appellants*
\

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request that the Court hear oral argument on this

appeal.

Respectfully submitted,

_____/s/_____
GEORGE E. RICKMAN
DC Bar 433298
P.O. Box 21267
Kalorama Station
Washington, D.C.  20009-21267
georgerick11@comcast.net
*Counsel of Record for Appellants*

_____/S/_____
JANE ZARA, ESQ.
DC Bar # 982392
1611 Monroe St., NW
Washington, DC  20012
202-483-9303
jjzara@aol.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2012, I caused a true and exact copy of the

forgoing Corrected Brief for the Appellants to be delivered by E-Service to:

Stacey L. Anderson
Office of the Attorney General
441 4th street, NW
Washington, DC  20001
Stacey.Anderson@DC.gov
Respectfully submitted,


        /s/
GEORGE E. RICKMAN


        /s/
JANE ZARA